**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

SHARNIA PHILLIPS,                                )
                         Plaintiff,          )
    v.                                              )
                                )   Case No. 18-CV-00316

CITY OF CHICAGO, a Municipal Corporation; ANTHONY )
CUTRONE, in his individual and official capacities;     )   **Hon. Mary M. Rowland**
MICHAEL CAVANAUGH, in his individual and official )
capacities; JAZZY PEDREGOSA, in his individual and     )   **Magistrate Judge**
official capacities; JAMES FOY, in his individual and   )   **Maria G. Valdez**
official capacities; ROBERT WATERSTRAAT, in his         )
individual and official capacities; CHARLES BARONA, in )   **Jury Trial Demanded**
his individual and official capacities; DAVID GARCIA, in )
his individual and official capacities; ROBERT          )
CUMMINGS, in his individual and official capacities;    )
ROBERT HYMA, in his individual and official capacities; )
CRAIG MILLER, in his individual and official capacities; )
MATTHEW LUCKI, in his individual and official           )
capacities; TIMOTHY WOLF, in his individual and official )
capacities; ROBERT CURRAN, in his individual and        )
official capacities; TERENCE HUELS, in his individual and )
official capacities; JASON DEMAS, in his individual and  )
official capacities; RANDALL DARLIN, in his individual   )
and official capacities; PARIS THOMPSON, in his         )
individual and official capacities; MICHAEL CONROY, in  )
his individual and official capacities; COLIN O'SHEA, in )
his individual and official capacities; JOHN ORMOND, in )
his individual and official capacities; PAUL S. AMELIO, in )
his individual and official capacities; ORLANDO         )
SANCHEZ, JR., in his individual and official capacities; )
WILLIAM D. MURPHY, in his individual and official       )
capacities; MATTHEW LOCKITSKI, in his individual and    )
official capacities; RICHARD J. COYLE, in his individual )
and official capacities; PATRICK J. QUINN, in his       )
individual and official capacities; RAMON FLORES, in    )
his individual and official capacities; NICHOLAS LINKER, in )
his individual and official capacities; MICHAEL         )
PANTANO, in his individual and official capacities; BRIAN )
BARDSLEY, JR., in his individual and official capacities; )
JOHN HROMA, in his individual and official capacities;  )
JOSEPH BIRD, in his individual and official capacities;  )
EDUARDO B. VASQUEZ, in his individual and official      )
capacities; ELVIS TURCINOVIC, in his individual and     )

official capacities; SCOTT J. BERRY, in his individual and )
official capacities; OFFICER MOLINA, STAR #7996, in his )
individual and official capacities; MICHAEL NOWACKI, in )
his individual and official capacities; and other UNKNOWN )
DEFENDANTS and/or CO-CONSPIRATORS, )
)
Defendants. )

## THIRD AMENDED COMPLAINT

Plaintiff, SHARNIA PHILLIPS, by her attorneys, Peter A. Cantwell and Eliot D.

Hellman, for her Second Amended Complaint against the Defendants, CITY OF CHICAGO, a

Municipal Corporation, ANTHONY CUTRONE, MICHAEL CAVANAUGH, JAZZY

PEDREGOSA, JAMES FOY, ROBERT WATERSTRAAT, CHARLES BARONA, DAVID

GARCIA, ROBERT CUMMINGS, ROBERT HYMA, CRAIG MILLER, MATTHEW LUCKI,

TIMOTHY WOLF, ROBERT CURRAN, TERENCE HUELS, JASON DEMAS, RANDALL

DARLIN, PARIS THOMPSON, MICHAEL CONROY, COLIN O'SHEA, JOHN ORMOND,

PAUL S. AMELIO, ORLANDO SANCHEZ, JR., WILLIAM D. MURPHY, MATTHEW

LOCKITSKI, RICHARD J. COYLE, PATRICK J. QUINN, RAMON FLORES, NICHOLAS

LINKER, MICHAEL PANTANO, BRIAN BARDSLEY, JR., JOHN HROMA, JOSEPH BIRD,

EDUARDO B. VASQUEZ, ELVIS TURCINOVIC, SCOTT J. BERRY, OFFICER MOLINA,

STAR #7996, MICHAEL NOWACKI, and other UNKNOWN DEFENDANTS and/or CO-

CONSPIRATORS, states as follows:

## INTRODUCTION

1.      The plaintiff, Sharnia Phillips ("Ms. Phillips"), brings this civil rights action for

compensatory and punitive damages under 42 U.S.C. §§ 1983 and 1988, and the Fourth and

Fourteenth Amendments to the United States Constitution, against defendants, City of Chicago, a

municipal corporation ("Chicago"), Anthony Cutrone ("Cutrone"), Michael Cavanaugh, Jazzy

Pedregosa, James Foy, Robert Waterstraat, Charles Barona, David Garcia, Robert Cummings, Robert Hyma, Craig Miller, Matthew Lucki, Timothy Wolf, Robert Curran, Terence Huels, Jason Demas, Randall Darlin, Paris Thompson, Michael Conroy, Colin O'Shea, John Ormond, Paul S. Amelio, Orlando Sanchez, Jr., William D. Murphy, Matthew Lockitski, Richard J. Coyle, Patrick J. Quinn, Ramon Flores, Nicholas Linker, Michael Pantano, Brian Bardsley, Jr., John Hroma, Joseph Bird, Eduardo B. Vasquez, Elvis Turcinovic, Scott J. Berry, Officer Molina, Star #7996, Michael Nowacki, and Other Unknown Co-Defendants and Co-Conspirators (collectively, the "Police Officers") for the use of excessive force against Sharnia Phillips and for the false arrest, and false imprisonment of Sharnia Phillips ("Ms. Phillips").

2. In the late-night hours of January 16, 2017, Ms. Phillips was peacefully lying in bed waiting to fall asleep, in the rear, second-floor bedroom, in her home when two fully armed S.W.A.T. teams of Chicago Police Officers suddenly burst through her door wearing tactical gear and body armor and carrying assault weapons in a supposed search for weapons and other individuals.

3. Ms. Phillips was arrested, forcibly removed from her home, and forced to stand outside in the Chicago winter under armed guard while Police Officers ransacked her home pursuant to a fraudulently obtained search warrant looking for criminals and contraband that the officers either knew, or should have known were not there, or unreasonably, or in reckless disregard of the truth, believed were at that location.

4. The Police Officers' actions in utilizing a mechanized battering ram to knock down Ms. Phillips' door, forcing her outside at gunpoint, and then searching her home for contraband constitutes an unreasonable search and excessive use of force, in violation of Ms. Phillips' rights under the Constitution of the United States. The police actions that night also

constitute false arrest and false imprisonment, in violation of Ms. Phillips' rights under the Constitution of the United States.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. §§ 1331, 1343, and § 42 U.S.C. 1983, this court has original jurisdiction over Plaintiff's causes of action for excessive force, false arrest, and false imprisonment, arising under the Fourth and Fourteenth Amendments to the Constitution of the United States.  Pursuant to 28 U.S.C. § 1391, venue properly lies in the Northern District of Illinois because all of the events giving rise to Plaintiff's claims occurred in Cook County, Illinois.

6.      Pursuant to § 42 U.S.C. 1367, this Court also has the power to hear and adjudicate the plaintiff's concurrent claims arising under state law.

## PARTIES

7.      Plaintiff, Sharnia Phillips, is a resident of Chicago, Illinois.

8.      On January 16, 2017, and continuing through the present, defendant City of Chicago was a municipal corporation, organized and existing under the laws of the State of Illinois.

9.      On January 16, 2017, and, upon information and belief, continuing through the present, defendant Anthony Cutrone (individually, "Officer Cutrone"), Michael Cavanaugh, Jazzy Pedregosa, James Foy, Robert Waterstraat, Charles Barona, David Garcia, Robert Cummings, Robert Hyma, Craig Miller, Matthew Lucki, Timothy Wolf, Robert Curran, Terence Huels, Jason Demas, Randall Darlin, Paris Thompson, Michael Conroy, Colin O'Shea, John Ormond, Officer Amelio, Officer Sanchez, Officer Murphy, Matthew Lockitski, Officer Coyle, Officer Quinn, Ramon Flores, Nicholas Linker, Michael Pantano, Brian Bardsley, Jr., John

Hroma, Joseph Bird, Officer Vasquez, Elvis Turcinovic, Officer Berry, Officer Molina, Michael

Nowacki, and other Unknown Defendants and/or Co-Conspirators, (collectively, the "Police

Officers"), were officers, and agents and/or employees of the City of Chicago, and were involved

in the arrest of Plaintiff.

10.     At all times relevant hereto, the Police Officers were acting while on duty and/or

in the scope of their employment with the City of Chicago.

## **FACTUAL BACKGROUND**

11.     On Martin Luther King Jr., Day, Monday, January 16, 2017, at approximately

11:45 p.m., Ms. Phillips was peacefully lying in bed waiting to fall asleep, in the rear, second-

floor bedroom, of the home she owned located at 1408 W. 71st St., Chicago, Illinois (the

"Residence").

12.     The Residence was Ms. Phillip's second home, which she generally rented to

tenants in order to generate income.  However, in January of 2017, and for several months prior,

Plaintiff had used the house as her primary residence in order to conduct renovations at the

Residence.  Ms. Phillips lived alone at the Residence.

13.     Just before midnight, Ms. Phillips was awakened by a loud bang and the

reverberations of her house shaking.  She immediately roused herself from bed and went to the

front window to see why the house was shaking.

14.     When she looked out the window, Ms. Phillips was greeted by a scene pulled

straight from a Hollywood action movie.  She saw police cars parked with their headlights on

and flashing blue and red lights, and heard a person shouting over a loudspeaker, "1408 we have

a warrant for your arrest!"  She noted that the person on the loudspeaker did not use any names,

but only referred to the building's address.  The person on the loudspeaker did not make any

demand that the occupants surrender or give a sufficient opportunity to do so.  This in and of itself is a violation of Chicago's own rules and regulations for executing search warrants as promulgated in Chicago Police Department Special Order S04-19 Search Warrants ("Special Order S04-19"), a copy of which is attached hereto and marked as **Exhibit A**.

15.     Special Order S04-19 became effective September 3, 2015 and was in effect at the time Ms. Phillips' home  was ransacked.  Under Special Order S04-19 one of the requirements is that the Police Officers adhere to the Knock and Announce Rule and 725 ILCS 5/108-8.  *See* **Exhibit A** § VIII(D)(1)(a).  The City of Chicago has never released rules, guidelines, policies, or procedures to assist Police Officer in evaluating what constitutes providing a resident "a reasonable opportunity to allow entry."  The warrant executed by the Police Officers was ***NOT***, on its face, a "no knock warrant."  A copy of the Search Warrant is attached hereto and marked as **Exhibit B**.  Nor was there a request for a "no knock warrant" made in the Complaint for Search Warrant.  A copy of the Complaint for Search Warrant is attached hereto and marked as **Exhibit C**.

16.     Upon seeing the police in her street and hearing the announcement, Ms. Phillips – herself, a former law enforcement officer – immediately rushed to the staircase and sprinted to the first floor  to admit the police.

17.     However, at the moment that Ms. Phillips was in the process of reaching to unlock the front entrance of her home the door suddenly burst inwards.  A stun grenade (also known as a "flash bang" grenade) was thrown onto the floor of the foyer near Ms. Phillips' feet, blinding and disorienting her.

18.     Ms. Phillips immediately threw her hands up in surrender as a flood of police officers wearing tactical gear, helmets, body armor, and carrying automatic weapons charged

through the doorway and into her home, simultaneously shouting at Ms. Phillips to "Get down!" and demanding to know "Who else is in the house?"

19.     Heavily armed and armored officers then forced Ms. Phillips from her home and into the street on a cold and wet January night, wearing nothing but her pajamas, and without shoes or a coat.

20.     Ms. Phillips – still without shoes or coat – stood outside in the street, under the guard of a heavily armed officer, for approximately 45 minutes while the Police Officers ransacked her home.  Boxes, cabinets, and chests were thrown open and the contents removed, personal items were strewn about, ceiling tiles were displaced, and vents to the heating ductwork were detached from the walls throughout her house.  During the entire ordeal, Ms. Phillips reasonably believed that she was not free to leave, and was terrified that the Police Officers would execute her four-year old dog, named Willow, who is a Pitbull-Mastiff mix.

21.     The Police Officers' search found absolutely nothing of an illegal or contraband nature, nor any of the items or people listed in the search warrant. Nevertheless, Ms. Phillips' ordeal became well-known by neighbors and members of the community both while the incident was occurring, and in the time period immediately after.  Ms. Phillips eventually became aware that she was the subject of neighborhood chatter from friends in the community.

22.     Only after the Police Officers completed their search was Ms. Phillips finally permitted back into her home.

23.     Finally, at this point, Ms. Phillips was shown, for the first time, a search warrant for the premises, as well as for two individuals named Robert Gunn ("Robert") and Jasmine Gunn ("Jasmine") (collectively, "the Gunns").  The warrants provide for seizure of illegal

firearms, including assault rifles, and records of illegal firearm sales. Notably, the warrants do not provide for the arrest of either Robert, Jasmine, or anybody else for that matter.

24.     Ms. Phillips was asked about her former tenant, Norma Moore, whom she believes may have been the grandmother of Robert and Jasmine.

25.     Moore had not lived at the Plaintiff's Residence for at least 6 months.

26.     Robert Gunn and Jasmin Gunn had never lived at the Plaintiff's Residence .

27.     The Police Officers claimed that they had a "reliable informant," and said to Ms. Phillips, "You're law enforcement, so you know how this goes."

28.     Hours later, the Police Officers eventually departed, leaving Ms. Phillips' home in total disarray, and with a front door that, in the dead of winter, would neither lock nor even close. Ms. Phillips was neither charged with nor prosecuted for any crimes.

29.     The following day, Ms. Phillips went to the police station seeking an explanation as to why her home had been targeted for a tactical raid by S.W.A.T. teams and other police officers of the Chicago Police Department. She was informed, and learned for the first time, that her home had been under surveillance the entire previous day. However, the only person to have either entered or exited the house during the entire day was Ms. Phillips herself when she was gone for a period of time to go to the gym.

30.     Ms. Phillips also subsequently learned that there had been an inordinate and noticeable police presence on January 16, 2017 in the streets around her house.

31.     At no time did Plaintiff commit any crime that could possibly justify or lawfully authorize a search of her home or an arrest.

32.     The City of Chicago had established guidelines for the use of force by Chicago Police Officers. These guidelines are G03-02, 2, Use of Force Model, G03-02-01, and 3) Force

Options, G03-02-02 (collectively, the "Use of Force Guidelines"). The actions by the Police Officers constitutes an unnecessary escalation of force pursuant to Use of Force Guidelines. The Use of Force Guidelines authorize police officers to use only the amount of force reasonably necessary based on the totality of the circumstances.

33. The Use of Force Guidelines mandates that police officers must use persuasion, advice, and warning prior to the use of physical force, and modify their level of force used in relation to the amount of resistance offered by the citizen.

34. The Use of Force Guidelines define a cooperative subject as a person who is compliant without the need for physical force. The only methods authorized to control a cooperative subject are social control and verbal control, consisting of proximity to the subject and persuasion, advice, and warning.

35. At no time did Ms. Phillips ever act in a non-compliant manner as defined under the Use of Force Guidelines. Therefore, there was absolutely no justification for the escalation of force used by the Police Officers against Ms. Phillips.

36. Not only were the Use of Force Guidelines not followed, the City of Chicago's Use of Force Guidelines have been found to be wholly inadequate by the United States Department of Justice. On Friday, January 13, 2017, the United States Department of Justice Civil Rights Division (the "DOJ") and the United States Attorney's Office Northern District of Illinois (the "U.S. Attorney's Office") released a report entitled Investigation of the Chicago Police Department (the "Report"). A true and correct copy is attached hereto and marked as **Exhibit D**.

37. The DOJ and the U.S. Attorney's Office concluded in the Report that: 1) the Chicago Police Department Uses Deadly Force in Violation of the Fourth Amendment and

Department Policy; 2) the Chicago Police Department Uses Less-Than Lethal Force in Violation of the Fourth Amendment and Department Policy; 3) Video Evidence Suggests a Broader Pattern or Practice of Unconstitutional Use of Force; and 4) the Chicago Police Department Does Not Effectively Use Crisis Intervention Techniques to Reduce the Need for Force.

38.    The Report was released three days prior to the excessively forceful, illegal, unnecessary, overzealous, and unconstitutional search of Ms. Phillips' home.  The Report plainly documents the deficient policies and procedures maintained by the City of Chicago as it relates to use of force, as well as the lack of training and oversight maintained by the City of Chicago of the procedures now in place.

39.    The City of Chicago has to the date of this Second Amended Complaint, failed to reform and implement new guidelines and training to address its police department's failures relating to the use of force identified in the Report.

40.    Further exhibiting the City of Chicago's lack of proper procedures and failure to train the Police Officers in its existing procedures is the manner in which the Search Warrant was drafted, investigated, approved, and executed.  Officer Cutrone and the other Police Officers' investigation of the claims made by the "reliable informant" was improper and deficient pursuant to Special Order S04-19.  Had the Police Officers been properly trained, had they investigated the "reliable informant's" information, had they conducted proper surveillance, and had the search warrant been reviewed and approved by a supervising officer of a rank of lieutenant, they would have quickly realized the informant's information was stale and Ms. Phillips would never had been subjected to the trauma of having her front door knocked down by a mechanized battering ram, getting flash banged, and held outside her home at gunpoint.

41.     In violation of Fourth Amendment requirements, Officer Cutrone and other police officers ("the Investigators") conducted an intentionally or recklessly inadequate investigation of Plaintiff's Residence in support of their search warrant application because they failed to corroborate – through independent, police investigation – any of the alleged "facts" provided by their anonymous informer that would have been both legally relevant and necessary to support the search warrant.

42.     The Investigators similarly failed to establish that the anonymous informer was reliable and had sufficiently detailed information to pass muster under the Fourth Amendment. These failures were done intentionally, knowingly, or with reckless disregard for the truth.

43.     First, and perhaps most fundamentally, the Investigators failed to "corroborate" that Robert and/or Jasmine Gunn lived at the Plaintiff's Residence at the time of the raid (they did not) using even basic police investigatory methods, such as (1) corroborating that any governmental, property, or utilities records for the Residence were associated with Robert or Jasmine Gunn, or (2) corroborating that any vehicles parked at the Residence were registered to Robert or Jasmine Gunn;

44.     Investigators failed to corroborate that Robert and/or Jasmine Gunn have ever lived at the Plaintiff's Residence (they have not);

45.     Investigators failed to corroborate that Robert and/or Jasmine Gunn owned the Plaintiff's Residence (they did not);

46.     In fact, the Investigators failed to corroborate that Robert and/or Jasmine Gunn were even present inside the Plaintiff's Residence for any reason on the date of the raid (they were not) through basic police surveillance, despite having the Residence under observation!

47.     Nor did the Investigators "corroborate" that Robert and/or Jasmine Gunn had been present inside the Plaintiff's Residence for any reason, at any time, during the preceding six months (they had not).

48.     Next, Investigators failed to corroborate that on the date of the raid – or at any time! – assault rifles were present inside the Residence (they were not), through basic police investigatory techniques such as (1) police surveillance, (2) a "controlled buy," (3) a search of the garbage leading to the discovery of wrapping, packing, or cleaning materials, or (4) any of the myriad other investigatory tools at the Investigators' disposal.

49.     Investigators likewise failed to corroborate that assault rifles had been present inside the Plaintiff's Residence at any time during the preceding six months (they were not);

50.     Investigators did not corroborate that assault rifles – or any items even resembling assault rifles, such as the gray, plastic storage totes – were ever seen entering or leaving the Residence;

51.     Investigators did not corroborate that Robert or Jasmine Gunn were ever seen entering or leaving the Residence with assault rifles, gray storage totes, or any item of any kind resembling assault rifles;

52.     Investigators did not corroborate that Robert and/or Jasmine Gunn had ever owned or possessed assault rifles;

53.     Investigators did not corroborate that Robert or Jasmine Gunn were ever seen in any other location, at any time, with assault rifles, gray storage totes, or any item of any kind resembling assault rifles;

54.     Investigators never corroborated whether Robert or Jasmine Gunn had previously been arrested or convicted for possessing illegal firearms; they never corroborated that either

12

Robert or Jasmine Gunn had a criminal history of trafficking assault rifles, or any type of firearm, whether legal or illegal;

55.     Investigators never "corroborated" that upwards of 10 assault rifles in gray, plastic tote containers were available for sale on the legitimate market, or had recently been recently purchased, or had recently been stolen by anyone, anywhere, or were in the process of being trafficked, or were otherwise available on the black market.

56.     Furthermore, the Investigators failed to establish any factual basis to evaluate the reliability of the confidential informant.

57.     Investigators failed to establish 1) the identity of the anonymous informer, 2) a reason to explain why that informer would have information, 3) whether the informer had previously given information, or 4) how reliable that information had been;

58.     Investigators failed to establish 1) the informer's connection to Robert and Jasmine Gunn, 2) why the informer was in the house during the weapons sale in the first place, and 3) whether the informer played any role in the weapons sale;

59.     The anonymous informer did not provide any information that would implicate him/her as being involved in the alleged sale of weapons at the Residence, or implicate him/her in some other related crime, or provide any information whatsoever that was against his/her own penal self-interest.

60.     Indeed, the complaint for search warrant even failed to include the perfunctory, wholly conclusory, and ultimately legally irrelevant assertion that the informant "is reliable."

61.     The anonymous informer neither drafted nor signed his/her own affidavit, but instead merely ratified the affidavit of the Investigators;

62.     The anonymous informer failed to testify before the judge that issued the warrant, depriving the judge of the opportunity to test his/her veracity and reliability.

63.     Investigators never corroborated the anonymous informer's alleged identification of Robert and Jasmine Gunn through a photo lineup. Rather, the informer was simply shown pictures of the Gunns and asked to confirm their identity;

64.     Instead of abiding by Fourth Amendment mandates and corroborating legally critical and relevant facts , the so-called "investigation" consisted of nothing more than unsubstantiated accusations from an anonymous, unreliable informer that were then "corroborated" by subsequent, and equally unsubstantiated accusations from the same anonymous informer, or the legally insignificant observations of police officers.

65.     The anonymous and unreliable informer told police a wholly unsubstantiated tale that he/she had supposedly witnessed an illegal arms transaction inside a house at 1408 W. 71st Street.

66.     This information was supposedly "corroborated" by having the anonymous and unreliable informer drive to the neighborhood with police and point out that there is indeed a house at 1408 W. 71st Street, which – in isolation – is innocent, mundane, publicly evident, and legally insignificant.

67.     Officer Cutrone then searched for the property records of 1408 W. 71st Street and found pictures of the property which "corroborated" nothing more than the fact that there is indeed a house at 1408 W. 71st Street

68.     Other investigating police officers looked at the pictures from property records and once again "corroborated" the innocent, mundane, publicly evident, and legally insignificant fact that there is indeed a house at 1408 W. 71st Street.

14

69.     Instead of corroborating a factual connection of some kind between the Plaintiff's Residence and either Robert or Jasmine Gunn, or assault rifles, the Investigators simply confirmed, reconfirmed, and thrice confirmed the innocent, mundane, publicly evident, and legally insignificant fact that there is a red, single-story house located at 1408 W. 71st Street.

70.     In a case predicated upon (1) the illegal possession of assault rifles, 2) by Robert and/or Jasmine Gunn, (3) inside a house located at 1408 W. 71st Street, the police investigation corroborated no fact of legal consequence that would demonstrate that evidence of a crime would be found in Plaintiff's Residence.

71.     The only thing the Investigators actually "corroborated" was the innocent, mundane, publicly evident, and legally insignificant fact that there is a red house located at 1408 W. 71st Street, Chicago, Illinois.

72.     Despite knowing that they lacked sufficient information demonstrating probable cause, the Investigators subsequently adorned the affidavit and complaint for a search warrant with an elaborate, but inconsequential "window dressing" of innocent facts. This was intended to dupe, deceive, and otherwise distract from the plain reality that no police officer would reasonably believe that the facts set forth in the affidavit were sufficient to support a finding of probable cause that  Robert and Jasmine Gunn were in possession of firearms at 1408 W. 71st Street, Chicago, Illinois. This scheme was implemented by the Investigators intentionally, knowingly, or with reckless disregard for the truth.

73.     Prior to their raid on January 16, 2017, the Police Officers knew, or should have known, that Sharnia Phillips was the rightful, titled owner of the house at 1408 W. 71st street. They knew or should have known that she was a former law enforcement officer who had no

criminal history and no outstanding warrants. They knew or should have known that Sharnia Phillips was unrelated to Robert or Jasmine, the two individuals listed on the search warrants.

74.     The police knew or should have known that Ms. Phillips was the only person to have entered or exited the house on January 16, 2017, and the Police Officers knew or should have known that Phillips did not match the description of either Robert (a man) or Jasmine, who was 20 years younger and 25 lbs. thinner than Ms. Phillips, who is barely five feet tall and a 135 lb. female.

75.     The only connection between Robert Gunn, Jasmine Gunn, and the house at 1408 W. 71st Street of which the Police Officers were supposedly aware was that Norma Moore, a possible relative of Robert and Jasmine Gunn, was previously a tenant at that address. However, given that the Police Officers knew the only connection to the Gunns was through Moore, the Police Officers also knew, or should have known, that Moore had not lived at 1408 W. 71st Street for approximately six months and thus their information about Robert and Jasmine Gunn was stale.

76.     Nevertheless, Officer Cutrone, either knowingly, or with a reckless disregard for the truth, fraudulently obtained two search warrants from the Circuit Court of Cook County for the premises at 1408 W. 71st Street. Because the warrant was premised on information that was either knowingly presented as false or presented as true in reckless disregard for the truth, the warrant itself was void.

77.     Upon obtaining the warrant, dozens of police officers descended on the Plaintiff's Residence in the dead of night. Those police officers actually present at the Residence during the raid knowingly, or in reckless disregard of the truth, executed an unconstitutional search that they knew, or should have known, was not supported by probable cause because no police

16

officer would reasonably believe that the facts set forth in the complaint for a search warrant were sufficient to support a finding of probable cause that evidence of a crime would be found at the Plaintiff's Residence.

78.     Furthermore, Officer Cutrone's preparation of the search warrant complaint and procurement of the search warrants was in violation of Special Order S04-19.  Special order S04-19 requires that "*The designated unit Supervisor the rank of lieutenant or above*" examine the Complaint for Search Warrant prior to the application for and the execution of the warrant.  The reviewing lieutenant is to "i*ndicate approval of both the Complaint for Search Warrant and the Search Warrant by initialing with star number and recording the date of approval and deconfliction number in the lower-left margin of the face side of each original document.*"

79.     No individual officer with a rank of lieutenant or above ever reviewed the two search warrant complaints prior to the application for and execution of the search warrant. Instead, the Complaint for Search Warrant and the Search Warrant were reviewed and approved by *Sergeant* Timothy Wolf, as indicated by the T.W. initials and his badge number 431 in the lower left margin.

80.     The City of Chicago did not even follow its own guidelines when it sent almost twenty police officers to execute two search warrants on Ms. Phillips' home.

81.     Plaintiff had engaged in no criminal or otherwise suspicious acts, and the entry, restraint, and search of Plaintiff and Plaintiff's home was in violation of the Fourth and Fourteenth Amendment guarantee against unreasonable searches and seizures, and of her right to due process.

82.     In addition to the violation of her civil rights on January 16, 2017, Ms. Phillips developed Post-Traumatic Stress Disorder, and as a result, was forced to undergo extensive

psychiatric and mental health treatment that continues to the present day. Ms. Phillips' peace of mind has been destroyed, she has been unable to sleep, and she has been unable to attend to the normal affairs of daily life, including work and schooling.

## COUNT I - FALSE ARREST #1

83.     Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

84.     No police officer would reasonably believe that the facts set forth in the affidavit were sufficient to support a finding of probable cause that  Robert and Jasmine Gunn were in possession of firearms at 1408 W. 71st Street, Chicago, Illinois.

85.     As a result of the actions of Officer Cutrone, the Police Officers, and other Unknown Officers, acting both individually and as co-conspirators, the Plaintiff was deprived of her rights, privileges and immunities under the United States Constitution, including but not limited to, the Fourth and Fourteenth Amendments, and of the laws of the State of Illinois.

86.     As a further direct and proximate result of the Police Officers' actions, Plaintiff suffered damages including pain and suffering, mental trauma, loss of liberty, extensive damage to property, damage to reputation, legal expenses, and further and other injuries and damages.

WHEREFORE, Plaintiff SHARNIA PHILLIPS demands judgment against Defendant ANTHONY CUTRONE, the POLICE OFFICERS, and other UNKNOWN DEFENDANTS and/or CO-CONSPIRATORS pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and other such relief as this Court deems just and equitable.

18

## COUNT II - FALSE ARREST #2

87.     Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

88.     Although a search warrant was issued for Plaintiff's home, it did not demonstrate the existence of probable cause to arrest the Plaintiff on its face. Furthermore, the search warrant was fraudulently obtained by police officers who conducted a recklessly insufficient investigation, and then procured the search warrant from the magistrate based on false information that officers knowingly and fraudulently presented as true, or presented as true in reckless disregard for the truth.

89.     In the alternative, no police officer would reasonably believe that the facts set forth in the affidavit in support of the warrant were sufficient to support a finding of probable cause that  Robert and Jasmine Gunn were in possession of firearms at 1408 W. 71st Street, Chicago, Illinois. Consequently, the Police Officers knew, or should have known, that the warrant was void.

90.     Notwithstanding the existence of legal process in the form of a search warrant, no probable cause to arrest the Plaintiff ever arose due the Police Officers' fraud, or reckless disregard for the truth, and the warrant procured was void.

91.     As a result of the actions of Officer Cutrone, the Police Officers, and other Unknown Officers, acting both individually and as co-conspirators, the Plaintiff was deprived of her rights, privileges and immunities under the United States Constitution, including but not limited to, the Fourth and Fourteenth Amendments, and of the laws of the State of Illinois.

92.     As a further direct and proximate result of the Police Officers' actions, Plaintiff suffered damages including pain and suffering, mental trauma, loss of liberty, extensive damage to property, damage to reputation, legal expenses, and further and other injuries and damages.

WHEREFORE, Plaintiff SHARNIA PHILLIPS demands judgment against Defendant ANTHONY CUTRONE, the POLICE OFFICERS and other UNKNOWN DEFENDANTS and/or CO-CONSPIRATORS pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and other such relief as this Court deems just and equitable.

## COUNT III – EXCESSIVE FORCE

93.     Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

94.     At the time of the raid on Phillips' home, the Police Officers knew or should have known that neither Robert nor Jasmine were present in the house.

95.     During the raid, in which the Police Officers notably possessed only a search warrant – rather than an arrest warrant – for the premises, Robert, or Jasmine, they made no attempt to knock on the door of Phillips' home and serve the search warrant without violence.

96.     Instead, the Police Officers initiated the encounter by ramming Phillips' door with a mobile battering ram and threatened the occupant of the house – Phillips – with an "arrest warrant" which they patently knew they did not possess.

97.     Only seconds after threatening Phillips with arrest, police rammed down Phillips' door with a battering ram attached to a truck, threw stun grenades into the house, and overwhelmed the stunned and frightened Phillips with police officers wearing body armor and carrying assault weapons.

98.     A reasonable officer in the position of Officer Cutrone and the other Police Officers that raided Phillips' home would not have deployed a small army of police officers, given Phillips only seconds to respond to warnings, and then used a motorized battering ram and stun grenades, to serve a simple search warrant.

99.     No police officer would reasonably believe that the facts set forth in the affidavit in support of the warrant were sufficient to support a finding of probable cause that Robert and Jasmine Gunn were in possession of firearms at 1408 W. 71st Street, Chicago, Illinois. Consequently, the Police Officers knew, or should have known, that the warrant was void.

100.    As a result of the actions of Officer Cutrone, the Police Officers, and other Unknown Officers, acting both individually and as co-conspirators, the Plaintiff was deprived of her rights, privileges and immunities under the United States Constitution, including but not limited to, the Fourth and Fourteenth Amendments, and of the laws of the State of Illinois.

101.    As a further direct and proximate result of the Police Officers' actions, Plaintiff suffered damages, including pain and suffering, mental trauma, loss of liberty, extensive damage to property, damage to reputation, legal expenses, and further and other injuries and damages.

WHEREFORE, Plaintiff SHARNIA PHILLIPS demands judgment against Defendants ANTHONY CUTRONE, the POLICE OFFICERS, and other UNKNOWN DEFENDANTS and/or CO-CONSPIRATORS pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and other such relief as this Court deems just and equitable.

## <u>COUNT IV – CITY OF CHICAGO</u>

102.    Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

103.    At all times mentioned herein, the Police Officers and the CITY OF CHICAGO were acting under color of state law.

104.    Defendant CITY OF CHICAGO, at all times relevant hereto and described above, has with deliberate indifference maintained a policy of inadequate training and safeguards for officers concerning the constitutional rights of citizens, thereby causing the Police Officers to engage in unlawful conduct.  As already laid out, the City of Chicago did not follow its existing guidelines in obtaining and executing the search warrant used in connection with the raid on Ms. Phillips' home.  Further, the City of Chicago, as laid out above, did not follow its own inadequate use of force procedures.

105.    The City of Chicago has a documented history of not following existing procedures and not adequately training its officers on appropriate use of force.

106.    As a direct and proximate result of Defendant's actions, Plaintiff was deprived of her rights, privileges and immunities under the United States Constitution, including but not limited to, the Fourth and Fourteenth Amendments, and of the laws of the State of Illinois.

107.    As a further direct and proximate result of Defendant's action, Plaintiff suffered damages including pain and suffering, mental trauma, loss of liberty, extensive damage to property, damage to reputation, legal expenses, and further and other injuries and damages.

WHEREFORE, Plaintiff SHARNIA PHILLIPS demands Judgment against Defendant CITY OF CHICAGO, pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and other such relief as this Court deems just and equitable.

## COUNT V – STATE LAW TORTS

108.     Plaintiff reincorporates and realleges Paragraphs 1 through 82 as if fully set forth herein.

109.     Defendant Police Officers are liable to the Plaintiff for the state law claims of false imprisonment (aka "False Arrest"), malicious prosecution (aka "False Arrest #2"), intentional infliction of emotional distress, assault, and battery.

110.     As a direct and proximate result of foregoing willful and wanton and/or intentional acts and/or omissions of the Police Officers, Plaintiff suffered damages, including bodily injury, pain and suffering, and physical and mental trauma, loss of liberty, extensive damage to property, damage to reputation, loss of property, legal expenses, and other injuries and damages.

WHEREFORE, Plaintiff SHARNIA PHILLIPS demands Judgment against Defendants ANTHONY CUTRONE, the POLICE OFFICERS, and other UNKNOWN DEFENDANTS and/or CO-CONSPIRATORS in an amount to be determined at trial, punitive damages, attorneys' fees, costs, and other such relief as this Court deems just and equitable.

Respectfully submitted,
SHARNIA PHILLIPS

By:   /s/ Peter A. Cantwell
       One of Her Attorneys

Peter A. Cantwell, Esq.
Eliot D. Hellman, Esq.
CANTWELL & CANTWELL
30 N. LaSalle St., Suite 2850
Chicago, Illinois 60602
(312) 372-3000
Attorneys for Plaintiff
peterc@cc-legal.com